UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

MICHELE NICOLE KELLY,

     Plaintiff,

v.                                                                Case No. 3:16cv14-CJK

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,

     Defendant.

_____/

<u>MEMORANDUM ORDER</u>

This case is before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Michele Nicole Kelly's applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-34, and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-83.  The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c) and FEDERAL RULE OF CIVIL PROCEDURE 73 for all proceedings in the case, including entry of final judgment.  Upon review of the record before the court, I conclude the findings of fact and determinations of the Commissioner are

supported by substantial evidence.  The decision of the Commissioner, therefore, will

be affirmed and both applications for benefits will be denied.

## ISSUE ON REVIEW

Ms. Kelly, who will be referred to as claimant, plaintiff, or by name, raises one

issue on appeal, arguing the ALJ erred in giving little weight to the opinion of her

treating physician, Dr. Adam Tarnosky, and treating psychiatrist, Dr. Annie Cherian,

and giving great weight to the opinions of state agency consultants, Dr. Robert

Hodes and Dr. Patrick Peterson.

## PROCEDURAL HISTORY

Ms. Kelly filed her applications for DIB and SSI on February 23, 2012,

alleging disability beginning August 25, 2011.[1]  T. 49.[2]  Her claims were denied

initially and on reconsideration.  T. 170-92.  After filing a request for a hearing, Ms.

Kelly appeared before an Administrative Law Judge ("ALJ") on February 25, 2014.

T. 46-88.  On May 22, 2014, the ALJ issued a decision denying her claims for

benefits.  T. 23-40.  Ms. Kelly petitioned the Appeals Council for review of the ALJ's

---

[1] Ms. Kelly initially identified her onset date as August 24, 2011.  She later amended it to August 25.

[2] The administrative record, as filed by the Commissioner, consists of 10 volumes (docs. 12-1 through 12-9) and has 746 consecutively numbered pages.  References to the record will be by "T.," for transcript, followed by the page number.

decision.  T. 15.  The Appeals Council denied her request; as a result, the ALJ's

decision became the final determination of the Commissioner.  T. 1-5.

## FINDINGS OF THE ALJ

In her written decision, the ALJ made a number of findings relevant to the

issues raised in this appeal:

- "The claimant has the following severe impairments: history of seizures,
  migraine headaches, lumbar radiculopathy, left hip bursitis,
  osteoarthritis, asthma, history of gastroparesis, obesity, depression,
  bipolar disorder, anxiety, and history of alcohol abuse, not material and
  in remission (20 CFR 404.1520(c) and 416.920(c))."  T. 25.

- Ms. Kelly has the residual functional capacity to perform less than light
  work, as  defined in 20 CFR 404.1567(b) and 416.967(b).  She can lift
  and carry 10 pounds frequently and 20 pounds occasionally and sit for
  a total of 6 hours and stand and walk for a total of 4 hours each during
  an 8-hour workday.  She can frequently use her upper and lower
  extremities to push and pull; she also can frequently balance, stoop,
  kneel, crouch, crawl, and climb ramps and stairs.  She cannot climb
  ladders, ropes, or scaffolds.  She can frequently reach overhead and

continuously handle, finger, and feel, but she must avoid exposure to extreme heat or cold and pulmonary irritants. She cannot work around unprotected heights or dangerous machinery and, because of her history of seizures, she should not drive or work around large bodies of water or open flames. She is limited to simple routine tasks involving no more than simple, short instructions, as well as jobs with simple work related decisions and few workplace changes. She can interact with the general public only occasionally, but can sustain concentration and attention for two-hour periods. T. 28.

- "The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965)." T. 38.

- "Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a))." T. 38.

- "The claimant has not been under a disability, as defined in the Social Security Act, from August 24, 2011, through the date of this decision. (20 CFR 404.1520(g) and 416.920(g))" T. 39.

<u>STANDARD OF REVIEW</u>

A federal court reviews the "Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (*quoting Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

When reviewing a Social Security disability case, the court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the

[Commissioner.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)); *see also Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015) ("In determining whether substantial evidence supports a decision, we give great deference to the ALJ's factfindings.") (*citing Black Diamond Coal Min. Co. v. Dir., OWCP*, 95 F.3d 1079, 1082 (11th Cir. 1996)).  A reviewing court also may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983).  Review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d 1273 (11th Cir. 1985).[1]

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

---

[1] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision.  *See Ingram v. Comm'r of Soc. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

423(d)(1)(A).  To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2.  If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.  If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.  If the claimant's impairments do not prevent her from performing her past relevant work, she is not disabled.[2]

---

[2] Claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  *Chester v. Bowen*, 792 F. 2d 129, 131 (11th Cir. 1986).

Case No. 3:16cv14-CJK

5.  Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates the claimant's residual functional capacity and vocational factors, she is not disabled.

Step five (or step four in cases where the ALJ decides a claimant can perform past work) is generally where the rubber meets the road.  At that point, the ALJ formulates the all-important residual functional capacity ("RFC").    The ALJ establishes RFC, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence; and (2) the claimant's subjective complaints (generally complaints of pain).  Residual functional capacity is then used by the ALJ to make the ultimate vocational determination required by step five.[3]  "[R]esidual functional capacity is the most [a claimant] can still do despite [claimant's] limitations.[4]  20

---

[3] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.) We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."  20. C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[4] In addition to this rather terse definition of RFC, the Regulations describe how the Commissioner makes the assessment:

(3) Evidence we use to assess your residual functional capacity. We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity.  (See § 416.912(c).)  However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative

C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  Often, both the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict and that conflict leads, as in this case, to the points raised on judicial review by the disappointed claimant.

## FACT BACKGROUND[5]

Ms. Kelly was 39 years old at the time of the hearing.  T. 52.  She completed the eleventh grade and had not worked since her alleged onset date.  T. 52.  She had past relevant work as a daycare worker and waitress.  T. 52-53.  When asked why she felt she was unable to work, Ms. Kelly responded:

> I stay in my room a lot.  I stay alone.  I stay in a lot of pain.
> I have trouble walking.  I can't stand for a long period of
> time.  I stay on pain medicine.  I just lay in bed because I'm
> so depressed.  I'm just depressed a lot.  I can't be around
> anybody.

---

examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources.  (See §§ 416.912(d) through (f).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 416.913.) We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends or other persons.  (See paragraph (e) of this section and § 416.929.)[.]

20 C.F.R. § 416.945(a)(3).

[5]  The medical and historical facts of this case, as set out below, were derived primarily from plaintiff's testimony at the hearing and also the administrative record.

T. 54.

Ms. Kelly received mental health treatment at Lakeview Center.  T. 63.  At the time of the hearing, she had an appointment once every three months.  T. 63.  She explained she initially saw a different person each time she went to Lakeview,  but eventually started seeing Ms. Poet, a counselor, on a regular basis.  T. 63.  She had seen Ms. Poet 3 times as of the date of the hearing.  T. 63.  Ms. Kelly was prescribed medication for depression, anxiety, and bipolar disorder.  T. 64.  She said she took her medications, but "they d[id]n't work."  T. 64.  She had never received inpatient treatment for mental health issues.  T. 65.

When discussing her outpatient treatment, Ms. Kelly said she "ha[d] to go.  I have problems dealing with life.  I have to go see my psychiatrist.  I deal with a lot of stress. . . . I have to go and talk to him or her and try to get on right medications. Like I said earlier, I'm usually away from everybody. I stay alone.  I just can't be around people.  I just can't do it."  T. 65-66.  At the time, however, Ms. Kelly lived with her mother, who also suffered from mental health issues, her 4-year old daughter, and her boyfriend.  T. 66.

With regard to the daughter, Ms. Kelly testified "[s]he pretty much stays – my room is close to her room, so she pretty much plays by herself, and my mom is there

so my mom kind of keeps an eye out on her.  And my boyfriend lives there too, so when he comes home from work he pretty much takes care of her and feeds her and things like that." T. 66.  She said her "boyfriend usually does everything," despite the fact he worked from early in the morning until about 5:00 in the afternoon.  T. 68.  When he was not around, her "mom w[ould] ask her what does she need and I tell my mom what she needs, and my mom just asks me questions about what my daughter needs and she gets what my daughter needs." T. 67.  Her daughter also was "tall enough to reach to get things on her own." T. 68.

At times, however, Ms. Kelly bathed, dressed, and played with her daughter. T. 68.  She occasionally went outside with her daughter and would "sit on the bench and watch her for probably maybe 20 minutes or so, and then . . . go back inside [her] room." T. 75.  Her boyfriend took her daughter to all activities and functions, such as birthday parties and the park.  T. 75.  Ms. Kelly said she never picked up or carried her daughter, who weighed 32 pounds at the time of the hearing.  T. 73-74.  When confronted with prior testimony she lifted and carried her daughter at 20 pounds, Ms. Kelly said she quit doing those things because of her shoulder.  She explained "[o]nce my shoulder started hurting when I realized that it's hard for me to wash my hair and when I stood in the shower and my feet started hurting and burning and my shoulder

started hurting when I was washing, when I started washing my hair and all." T. 74.

Plaintiff described her typical day as follows: "Well, I pretty much get up and get me something to drink, and I pretty much go in my room and stay in my room and just lay there and don't get around anybody. I make sure my mom checks on my four-year-old, and I just lay in my bed. Sometimes I cry. You know, right now I'm having a rough time dealing with life . . . ." T. 66-67. When going to the doctor or grocery store, Ms. Kelly took a cab.[6] T. 69. She sometimes went grocery shopping with her mother or boyfriend. T. 69. She could make cereal, use the microwave "if [she] fe[lt] like it," and make a sandwich. T. 72. She watched television but "[n]ot all the time because [she was] too depressed." T. 72. When in her room, she "just la[id] there in [her] bed. [She] really [didn't] do anything besides lay there" because she was "too depressed" and had "a lot going on in [her] head." T. 73.

She saw her family practitioner, Dr. Tarnosky, "maybe once every two weeks." T. 73. He treated her for a myriad of health issues. She engaged in no other activities outside the home, but occasionally had friends over and would "sit on the couch." T. 74-75. Ms. Kelly said she could lift and carry 5 to 10 pounds. T. 75. She could not estimate the amount of time she could sit, stand, or walk, but explained she was

---

[6] There is an indication in the record she had no vehicle "due to DUIs." T. 96.

"doing all right right now, but usually [her] back [was] burning or [her] hip [was] bothering [her].  But it just depend[ed]  how bad the pain in [her] hip and [her] back hurt."  T. 76.

Ms. Kelly suffered from seizures but could not recall the last time she had one. T. 54.  She said it was "[p]robably maybe five/six months ago."  T. 54.  She was taking Topamax, an anti-seizure medication.  T. 54.  She said the seizures were not severe enough to cause her to go to the emergency room or be treated at a hospital. T. 54-55.  When asked to describe the seizures, however, she said "when they get real bad I do have to go to the ER, but when they're light they're not where I have to go to the ER because Topamax kicks in and it doesn't make it as bad."  T. 55.  It had been a while since she had been to the emergency room.  T. 55.

Ms. Kelly also had migraine headaches.  When the ALJ asked about them, she said she had one two days ago and had to take "1,200 milligrams of Gabapentin" and "two things" of Imitrex.  T. 55.  She said "I have to take that and I have to lay down in a dark room.  I had to have a hot washcloth over my head.  And it takes – it depends.  Sometimes it takes a couple of days and sometimes it takes a day.  It just depends how bad it gets.  And sometimes I have to go to the ER and they have to give

me a shot of – it's a narcotic."[7]  T. 55-56.  The medicine did not always alleviate the

headache, which occurred two to three times a week.  T. 56.

With regard to her back, Ms. Kelly testified "[e]very day my back hurts.  My

lower back hurts every day.  It hurts bad where I can't move.  I literally have to either

sit or lay down, and that's every day.  As a matter of fact, I just saw Dr. Ternowski

[*sic*] yesterday and he's not sure what's going on with my back.  He wants to do an

MRI to see what's going on."  T. 56.  Her right shoulder no longer bothered her as

much, except she could not take a shower.  T. 58.  She said "[l]ike when I wash my

hair, my arm hurts so bad when I was [*sic*] my hair.  Excuse me.  When I take a

shower and wash my hair, my shoulder hurts real bad."  T. 58.  She was on pain

medication for her back, hip, and shoulder, but it "d[idn't] work all the time."  T. 58.

Ms. Kelly also had asthma.  T. 59.  She testified she used an inhaler two or

three times a week; she asked to use it during the hearing.  T. 59.  She used a

nebulizer once a week.  T. 59.  She had never been to the emergency room or treated

for any "type of asthma exacerbation episode."  T. 59.

She had gastroparesis, for which she received treatment at Sacred Heart

Hospital.  T. 59.  The doctor prescribed Prilosec, which did not help.  T. 60.  She

---

[7] When Ms. Kelly visited the emergency room for a migraine on September 13, 2013, the doctor was suspicious of "secondary gain or narcotic seeking behaviour."  T. 635.

"r[an] to the bathroom continuously" because of diarrhea.  T. 60.  The condition also caused her to "stay cold."  T. 60.  She was on a special diet, but it did not work.  T. 61.  She took diet pills for thirty days, but did not lose any weight.  T. 62.  She was 5'1" tall and weighed 197 pounds at the time of the hearing.  T. 62.  She had never been to the emergency room, however, or hospitalized as a result of "digestive issues."  T. 62.

At issue in this appeal are the opinions of Dr. Tarnosky and Dr. Cherian, as well as those of Dr. Hodes and Dr. Peterson.  Dr. Tarnosky completed a Medical Source Statement on June 10, 2013, indicating Ms. Kelly could constantly lift/carry up to 5 pounds, frequently lift/carry up to 10 pounds, and never lift/carry more than that.[8]  T. 673.  In an 8-hour work day, according to the statement of Dr. Tarnosky, Ms. Kelly could sit for 8 hours and stand and walk for 1 hour each.  T. 673.  She could constantly reach above her head, frequently reach in all other directions, and never squat, crawl, or stoop.  T. 673.  There were no limitations in the use of her hands, but she could not use her feet for repetitive movement, such as pushing and pulling leg controls.  T. 673.  She had no limitations in exposure to extreme temperatures or

---

[8] According to Dr. Tarnosky's records, the day he completed the Medical Source Statement, Ms. Kelly stated she believed she was permanently disabled as a result of bipolar disorder and musculoskeletal issues.  T. 600.

wetness/humidity and could frequently be exposed to vibrations, but she was never

to be around hazards, such as machinery or heights.  T. 673.

Dr. Tarnosky estimated that, "[d]ue to acute exacerbations of pain or other

symptoms, side-effects from medications or other treatments, and/or routine medical

treatment," Ms. Kelly would be absent from work 5 or more days a month on average

and  would require 5 or more breaks a day in addition to a 1-hour lunch break and two

15-minute breaks.  T. 673.  She would be able to maintain focus and concentration

on simple, repetitive work for only 10 minutes at a time.  T. 673.  In a separate report,

Dr. Tarnosky stated that, in his opinion, Ms. Kelly was "unable to hold down a job

mainly because of the psychiatric problems," but her "physical complaints certainly

make it difficult to work for her as well, however."  T. 600.

Dr. Cherian completed a Treating Medical Source Opinion on March 10, 2014.

T. 710.  She indicated Ms. Kelly could frequently understand and carry out simple

instructions, maintain neatness and personal hygiene, ask simple questions and/or

seek assistance, and be aware of and avoid normal hazards.  T. 710.  In Dr. Cherian's

view, Ms. Kelly could occasionally understand and carry out detailed instructions,

remember work locations and procedures, perform activities within a schedule, be

punctual  within  customary  tolerances,  sustain  an  ordinary  routine  without

supervision, work with others without being distracted by them, work with others without distracting them, make simple work-related decisions, accept instructions and criticism from supervisors, and adapt to changes in routine work settings.  T. 710. Apparently deferring to Ms. Kelly's report she rarely left home or socialized, Dr. Cherian indicated Ms. Kelly could only occasionally interact with new customers or the general public.  T. 710.

Dr. Cherian could not say how long Ms. Kelly could maintain concentration in simple routine work without getting off task, noting it was "[d]ifficult to place an exact [amount of time] here, however a common symptom of patient's mood disorder is lack of concentration/focus." T. 710.  Dr. Cherian indicated Ms. Kelly would need unscheduled breaks 3 to 4 times a day in addition to 2 regularly scheduled breaks of 15 minutes and one 30-minute lunch break, although that "may vary."  T. 710.  On average, Dr. Cherian opined, Ms. Kelly  likely would be absent from work 3 to 4 times a month, as her "mood disorder tends to work in a cyclical manner in which symptoms may occur."  T. 710.

Dr. Hodes, a state agency consultant, reviewed the record and concluded Ms. Kelly had medically determinable impairments that reasonably could be expected to produce pain or other symptoms, but her statements about the intensity, persistence,

and functionally limiting effects of her symptoms were not substantiated by the objective medical evidence.  T. 119.  Dr. Hodes found Ms. Kelly only "[p]artially [c]redible."  T. 120.  He found mild restriction of activities of daily living; moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace; and no repeated episodes of decompensation.  T. 118.  In his opinion, Ms. Kelly could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk and sit about 6 hours in an 8-hour workday, and push and/or pull without additional restrictions.  T. 121.  There were no understanding or memory limitations, but there were limitations in sustained concentration and persistence.  T. 122.  According to Dr. Hodes, Ms. Kelly was not significantly limited in the ability to carry out very short and simple, as well as detailed, instructions; sustain an ordinary routine without special supervision; and work in coordination with or  proximity to others without being distracted by them. T. 122.   She was moderately limited in the ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and complete a normal workday and workweek without interruptions from psychologically based symptoms

and perform at a consistent pace without an unreasonable number and length of rest periods.  T. 122.

Dr. Hodes found Ms. Kelly moderately limited in the ability to interact appropriately with the general public and not significantly limited in the ability to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers and peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  T. 122-23.  She was able to sustain attention and persist at simple routine tasks for extended periods of 2-hour segments.  T. 123.   She also could "sustain effort across work day and work week with appropriate work breaks" and "maintain regular attendance."  T. 123.  He said she performed satisfactorily in situations with limited social contacts and responsibilities and was able to learn work rules and respond appropriately to changes in a routine work setting and adapt to the demands and pressures thereof.  T. 123.  Dr. Hodes found Ms. Kelly not disabled and capable of medium, unskilled work.  T. 124-25.

Dr. Peterson, another state agency consultant, also reviewed the record and made findings very similar to those of Dr. Hodes.  T. 143-53.  Like Dr. Hodes, Dr.

Peterson ultimately found Ms. Kelly not disabled and capable of medium, unskilled work.  T. 152.

As set forth above, based on the evidence of record, the ALJ found Ms. Kelly not disabled and to have the RFC to perform less than light work.  In so doing, she found Ms. Kelly "not entirely credible."[9]  T. 29.  Nevertheless, the ALJ determined Ms. Kelly had mild restriction in activities of daily living.  T. 26.  She noted Ms. Kelly testified she stayed in her room the majority of the day and relied on her mother and boyfriend to care for her daughter; however, Ms. Kelly consistently reported to healthcare providers she received little assistance from her mother or boyfriend.  T. 26. In the ALJ's view, Ms. Kelly's ability to care for her child indicated she was able to perform more activities than she admitted; she found Ms. Kelly capable of independent daily living.  T. 26.

With regard to social functioning, the ALJ found moderate difficulties.  T. 26. She noted Ms. Kelly said she had difficulty being around others, but records from Lakeview indicated the difficulty stemmed primarily from familial relationships.  T. 26.  The ALJ acknowledged Ms. Kelly frequently was irritable at appointments, but

---

[9] This was not the first time the ALJ had encountered Ms. Kelly.  In fact, this is Ms. Kelly's third claim for disability benefits and/or supplemental security income.  T. 28.  The ALJ in this case handled her last claim as well.  T. 92-107.

found no evidence of any history of altercations, evictions, firings, fear of strangers, or avoidance of interpersonal relationships.  T. 26.  No evidence indicated Ms. Kelly was "unable to maintain appropriate social relationships on a limited basis."  T. 26.

The ALJ determined Ms. Kelly had moderate difficulties in concentration, persistence, or pace.  T. 27.  "Despite the claimant's alleged mental impairments, mental status examinations [were] largely unremarkable for objective evidence of distinct limitations in communication, understanding, comprehension, concentration, or memory functioning."  T. 27.  "[C]laimant did not testify to, nor is there substantial evidence in the record of, any limitations that would adversely impact her ability to sustained [*sic*] focused attention and concentration sufficiently long enough to permit completion of tasks commonly found in work settings."  T. 27.  The ALJ found no episodes of decompensation of extended duration.  T. 27.  The ALJ credited Ms. Kelly's "testimony regarding some difficulties being around others" and reduced the RFC "to provide for occasional interaction with the general public."[10]  T. 37.

---

[10] A vocational expert, Jim Cowart, also testified at the hearing.  When given a hypothetical with restrictions consistent  with the RFC – essentially, a reduced range of light work, Mr. Cowart testified Ms. Kelly would not be able to perform any of her past work, but could perform other work in the regional or national economy.  T. 80-81.  He identified the following jobs: traffic checker, marker, and mail clerk, all of which are light and unskilled with an SVP of 2.  T. 82.  When given a hypothetical with the restrictions imposed by Dr. Tarnosky, he testified plaintiff could not perform any of her past work or any work in the national or regional economy.  T. 82-83.

In reaching her decision, the ALJ gave "greatest weight" to the opinions of Dr. Hodes and Peterson "that despite the claimant's moderate limitations in social functioning and concentration, persistence, and pace, she remains capable of performing simple, routine tasks, sustaining concentration and attention for two hour periods, and generally interacting appropriately with others."  T. 37.  The ALJ found the opinions of Drs. Hodes and Peterson "consistent with the medical evidence which shows conservative treatment for her alleged symptoms as well as continued noncompliance with treatment;" they also were "consistent with the claimant's ability to care for her young child since the alleged onset date."  T. 37.

The ALJ gave "little weight to limitations endorsed by Dr. Cherian and Dr. Tarnosky's opinion that the claimant [was] unable to hold down a job due to her psychiatric symptoms."  T. 37.  The ALJ noted "[p]rogress notes from Lakeview repeatedly document GAF scores representing moderate limitations in social or occupational functioning, which is consistent with the restrictions included in the residual functional capacity."[11] T. 37.  The ALJ also observed Ms. Kelly "ha[d] been

---

[11] The GAF rating has two components: (1) symptom severity and (2) social and occupational functioning.  The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within the range.  When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two.  The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") 34 (4th ed., text rev., 2000).  A GAF between 51 and 60 indicates "moderate symptoms (e.g., flat affect

treated conservatively with medication management and . . . ha[d] not required inpatient or emergent treatment for stabilization of her symptoms." T. 37. Moreover, Ms. Kelly "consistently reported she is the primary caregiver for her young child, which suggests a level of functioning that is significantly higher than the limitations endorsed by Dr. Cherian and Dr. Tarnosky." T. 37. "Finally, the [ALJ] note[d] that the claimant testified she ha[d] seen Dr. Cherian on only one occasion, suggesting a limited treatment history with her." T. 37.

The ALJ found Ms. Kelly's "testimony regarding her limitations resulting from her mental impairments . . . not supported by the medical evidence or her activities of daily living." T. 37. "In addition to noncompliance with recommendations for counseling, the claimant self-medicate[d] and self-adjust[ed] her medications." T. 37-38. Furthermore, "[m]ental status examinations fail[ed] to show significant deficits in concentration and attention. Progress notes indicate[d] the claimant reported

---

and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning;" a GAF between 61 and 70 indicates "mild" symptoms or "some difficulty in social, occupational or school functioning," but "generally functioning pretty well;" a GAF score between 71 and 80 indicates transient and expectable reactions to psychosocial stressors and no more than an slight impairment in social, occupational, or school functioning; a GAF score between 81 and 90 indicates no or minimal symptoms and good functioning in all areas. *Id.* The most recent edition of the Diagnostic and Statistical Manual no longer recommends use of the GAF scale, acknowledging that "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity and questionable psychometrics in routine practice." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

symptoms largely related to situational stressors." T. 38. "Despite this, [Ms. Kelly] frequently indicated she [was] the caregiver for her young child" and "stated she [was] able to make simple meals, watch television, grocery shop, and run errands." T. 38. "Ultimately, the [ALJ found] neither the objective medical evidence, nor the testimony of the claimant, establishe[d] that her ability to function ha[d] been so severely impaired as to preclude all types of work activity." T. 38.

## ANALYSIS

Ms. Kelly contends the ALJ erred in assigning little weight to the opinions of Drs. Tarnosky and Cherian, arguing they were treating physicians and, absent good cause, their opinions were entitled to considerable or substantial weight. *See Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Broughton v. Heckler*, 776 F.2d 960, 960-61 (11th Cir. 1985); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986). "Good cause" exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips,* 357 F.3d at 1241; *see also Lewis*, 125 F.3d at 1440 (citing cases). If a treating physician's opinion as to the nature and severity of a claimant's impairments is well-supported

by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record, the ALJ is to give it controlling weight. *See* 20 C.F.R. § 404.1527(c)(2). Where a treating physician has merely made conclusory statements, however, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen,* 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant *controlling* weight, the ALJ nevertheless must weigh the medical opinion based on (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical impairments at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d).

Opinions on certain issues, such as a claimant's RFC and whether a claimant is disabled, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of

disability."   20 C.F.R. §§ 404.1527(d), 416.927(d); *see* SSR 96-5p.   Opinions

reserved to the Commissioner, even when offered by a treating physician, are not

entitled to controlling weight or special significance.   *See* SSR 96-5p.   "Giving

controlling weight to such opinions . . . would be an abdication of the

Commissioner's statutory responsibility to determine whether an individual is

disabled."   *Id.*   Although a physician's opinions about what a claimant can still do or

the claimant's restrictions may be relevant, therefore, such opinions are not

determinative because the ALJ has the responsibility of assessing the claimant's RFC.

*See* 20 C.F.R. §§ 416.912(b)(2), 416.913(b)(6), 416.927(d)(2), 416.945(a)(3),

416.946(c); SSR 96-5p.

"When electing to disregard the opinion of a treating physician, the ALJ must

clearly articulate [her] reasons."   *Phillips*, 357 F.3d at 1241.   Failure to do so is

reversible error.   *Lewis*, 125 F.3d at 1440 (*citing MacGregor v. Bowen*, 786 F.2d

1050, 1053 (11th Cir. 1986)).   An ALJ may choose to accept some conclusions – or

restrictions – within an opinion while rejecting others.   If such a choice is made, in

addition to explaining the overall weight given to a particular medical opinion, the

ALJ also must explain "'with at least some measure of clarity the grounds for [a]

decision'" to adopt particular aspects of a medical opinion.   *Winschel*, 631 F.3d at

1179 (*quoting Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984)).  Failure to explain the rationale for crediting only certain aspects of an opinion will result in a reviewing court "declin[ing] to affirm 'simply because some rationale might have supported the ALJ's conclusion.'"  *Id*.

The ALJ's decision to assign little weight to the opinion of Dr. Tarnosky regarding plaintiff's physical limitations was based on her conclusion the limitations imposed were "inconsistent with his treatment records and those of the claimant's orthopedist, Dr. Morrison, which show minor abnormalities on physical examination."  T. 34.  The ALJ pointed out that "[s]traight leg raises were negative and [Ms. Kelly's] motor strength and sensation were intact.  There was only mild diffuse tenderness over the lumbar region and tenderness over the trochanters.  Nerve conduction studies were also normal."  T. 34.  The ALJ also found Dr. Tarnosky's opinion "inconsistent with the other medical evidence documenting improvement with medication in June, August, and September of 2013."  T. 34.  "In addition, these limitations and the indication that the claimant is only able to maintain focus for simple, repetitive work for 0-10 minutes due to pain are inconsistent with frequent references in the medical record throughout 2012, 2013, and 2014 that the claimant

is the primary caregiver for her young child suggesting that her functional limitations

are not as great as alleged."  T. 34.

Dr. Tarnosky's opinion also was expressed on a check-off form.  He gave no

explanation for his opinion and did not identify which of Ms. Kelly's conditions

caused the impairments he identified.[12]  A brief and conclusory statement that is not

supported by medical findings, even if made by a treating physician, is not persuasive

evidence of disability.  *Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir. 1987); *Warncke

v. Harris*, 619 F.2d 412, 417 (5th Cir. 1980).[13]  Indeed, in this instance, it is

impossible to know the bases of Dr. Tarnosky's opinion, and there otherwise is no

indication in the record that any of Ms. Kelly's physical impairments precluded work.

In fact, Dr. Tarnosky, a family physician, found Ms. Kelly unable to work because of

---

[10]  Where an opinion, even that of a treating physician, is offered on a form that does not detail evidence in the record supporting the work-related limitations identified, such opinion will not bind the Commissioner.  *See O'Leary v. Schweiker*, 710 F.2d 1334, 1341 (8th Cir. 1983) ("Because of the interpretive problems inherent in the use of forms such as the physical capacities checklist, our Court has held that while these forms are admissible, they are entitled to little weight and do not constitute 'substantial evidence' on the record as a whole."); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.  As we pointed out in discussing residual functional capacity reports, where these so-called reports are unaccompanied by thorough written reports, their reliability is suspect . . . . ") (internal marks omitted).

[13]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

mental, not physical, limitations.  Considering those facts, along with evidence of plaintiff's daily activities, the ALJ's decision to give little weight to Dr. Tarnosky's opinion regarding plaintiff's physical limitations finds support in substantial evidence of record.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986) ("The weight afforded a physician's conclusory statements depends upon the extent to which they are supported by clinical or laboratory findings and are consistent with other evidence as to claimant's impairments.").

To the extent Dr. Tarnosky opined Ms. Kelly could not work because of psychological impairments, his opinion is not entitled to controlling weight or special significance because it pertains to an issue reserved to the Commissioner.  In any event, the ALJ's decision to give little weight to Dr. Tarnosky's opinion regarding the impact of plaintiff's psychological condition is supported by substantial evidence in the record.  As the ALJ found, the limitations Dr. Tarnosky imposed were inconsistent with references in the medical records between 2012 and 2014 to Ms. Kelly being the primary caregiver for her young child.  T. 34, 510, 560, 585, 608, 688.  They also were inconsistent with the opinions of Drs. Hodes and Peterson, which were supported by substantial evidence in the record, and the lack of evidence of a disabling mental condition.  Dr. Tarnosky's opinion was inconsistent with Ms.

Kelly's activities of daily living, including grocery shopping and preparing meals for herself.  *See Phillips*, 357 F.3d at 1241.  The only evidence in the record to support Dr. Tarnosky's conclusion is plaintiff's statement she believed she was disabled, which is insufficient.

As a threshold matter with Dr. Cherian, the record does not make clear that she, in fact, was a treating physician.  *See* 20 C.F.R. §§ 404.1502, 416.902.  It appears that, at the time Dr. Cherian rendered the opinion favored by claimant, she may have examined Ms. Kelly only once and possibly solely in connection with completion of the medical source opinion form.[14]  If Dr. Cherian was not a treating physician, her opinion was not entitled to any deference or special consideration.  *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also  McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987) (holding that one-time examiners are not treating physicians for purposes of Social Security claims); *Gibson v. Heckler*, 779 F.2d 616, 623 (11th Cir. 1986) (same).  Ms. Kelly has not carried the burden of showing Dr. Cherian must be viewed as a treating physician.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting

---

[14] Plaintiff's testimony on this point is inconsistent.  Although she testified she saw Dr. Cherian only once, she later said she saw Dr. Cherian once before that "a while back."  T. 64.  She then said she never talked to her.  T. 77.

plaintiff bears the burden of proof with regard to the first four steps of the sequential evaluation process).[15]

Even assuming, as the ALJ apparently did, that Dr. Cherian was a treating physician, the ALJ's decision to give her opinion little weight is supported by substantial evidence in the record.  Dr. Cherian's treatment of Ms. Kelly, by all accounts, was limited.  Her opinion also was expressed on a check-off form.  In addition, like Dr. Tarnosky's opinion, Dr. Cherian's opinion was unsupported by, and inconsistent with, evidence in the record, including the opinions of Drs. Hodes and Peterson and Ms. Kelly's activities of daily living.  Again, Ms. Kelly "consistently reported she [was] the primary caregiver for her young child, which suggests a level of functioning that is significantly higher than the limitations endorsed by Dr. Cherian and Dr. Tarnosky."  T. 37.  Moreover, Ms. Kelly was "treated conservatively with medication management and she ha[d] not required inpatient or emergent treatment for stabilization of her symptoms."  T. 37.  Based on all the evidence in the record, the ALJ concluded "neither the objective medical evidence, nor the testimony of the

---

[15] Evaluation of a treating physician's testimony can occur at steps two through five of the sequential evaluation process.  Although the burden shifts to the Commissioner at step five to show other work claimant can perform given her RFC, consideration of a treating physician's opinions concerning RFC occurs at step five after the Commissioner has made that showing and claimant must rebut the Commissioner's showing.  Insofar as treating physicians are concerned, therefore, the burden remains on plaintiff.

claimant, establishes that her ability to function has been so severely impaired as to preclude all types of work activity."  T. 38.  The undersigned cannot say the ALJ erred in that finding, or in giving little weight to the opinion of Dr. Cherian.

The ALJ gave "greatest weight" to the opinions of Drs. Hodes and Peterson, who found Ms. Kelly capable of medium, unskilled work despite her limitations.  T. 37.  As recognized in the regulations, state agency medical and psychological consultants are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation."  *See* 20 C.F.R. § 404.1527(e)(2)(I).  Under the applicable law, an ALJ may rely upon, and must consider, the opinions of state agency consultants.  *See* 20 C.F.R. § 404.1527(e)(2).  Specifically, although not bound by such opinions, the ALJ "must consider findings and other opinions of state agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether [claimant is] disabled. . . ."  20 C.F.R. § 404.1527(e)(2)(I).

When considering the findings of a state agency medical or psychological consultant, the ALJ will look to factors "such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting

explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. § 404.1527(e)(2)(ii). The ALJ determines the weight afforded to consultants and, if the ALJ affords controlling weight to such a consultant, rather than to a treating source, the ALJ must explain the weight given to the opinion, just as with other medical sources. *Id.*

Here, not only did the ALJ adequately explain her reasons for giving more weight to the opinions of Drs. Hodes and Peterson, but that decision finds support by substantial evidence in the record. The ALJ noted Dr. Hodes' conclusion Ms. Kelly's "problems are more related to her dysfunctional personality than her mood disorder." T. 37. She also noted Dr. Hodes' opinion Ms. Kelly "is able to sustain attention and persist in simple tasks for extended periods of 2 hour segments," as well as his finding Ms. Kelly "is able to maintain regular attendance and be punctual within customary tolerances," "get along with workers and peers in an appropriate manner," and "perform satisfactorily in situations with limited social contacts and responsibilities." T. 37.

The ALJ found the opinions of Dr. Hodes and Peterson "consistent with the medical evidence which shows conservative treatment for [plaintiff's] alleged symptoms as well as continued noncompliance with treatment." T. 37. "This is also

consistent with the claimant's ability to care for her young child since the alleged onset date." T. 37. She discredited Ms. Kelly's testimony regarding limitations resulting from her mental impairments, finding it "not supported by the medical evidence or her activities of daily living." T. 37. The ALJ noted "[i]n addition to noncompliance with recommendations for counseling, the claimant self-medicates and self-adjusts her medications. Mental status examinations fail to show significant deficits in concentration and attention. Progress notes indicate the claimant reported symptoms largely related to situational stressors. Despite this, she frequently indicated she [was] the caregiver for her young child." T. 37-38. In addition, the ALJ observed, Ms. Kelly "stated she [was] able to make simple meals, watch television, grocery shop, and run errands." T. 38. Based on the record, the undersigned finds the ALJ's decision to give "greatest weight" to the opinions of Dr. Hodes and Peterson supported by substantial evidence.

## CONCLUSION

For the reasons set forth above, the undersigned finds the Commissioner's decision supported by substantial evidence and application of the proper legal standards.[16] *See Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his

---

[16] The court notes that, to the extent it reviewed the legal principles upon which the ALJ's decision is based, it conducted a *de novo* review. *See Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th

Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").

**ACCORDINGLY, it is ORDERED:**

The decision of the Commissioner is AFFIRMED and plaintiff's applications. for Disability Insurance Benefits and Supplemental Security Income are DENIED. The clerk is directed to close the file.

**DONE AND ORDERED** this 1st day of February, 2017.

/s/ *Charles J. Kahn, Jr.*

**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

Cir. 2005).

Case No. 3:16cv14-CJK